IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 29, 2022 Session

## STATE OF TENNESSEE v. OTTO KARL APPELT

**Appeal from the Criminal Court for Bradley County**
**No. 19-CR-367          Sandra Donaghy, Judge**

_____

### No. E2020-01575-CCA-R3-CD
_____

The Appellant, Otto Karl Appelt, was convicted in the Bradley County Criminal Court of vandalism of property valued more than $1,000 but less than $2,500, a Class E felony. After a sentencing hearing, the trial court sentenced him as a Range I, standard offender to two years to be served as four months in confinement followed by supervised probation and ordered that he pay $2,000 in restitution. On appeal, the Appellant contends that he was denied his right to counsel because the trial court failed to consider whether his waiver of counsel was knowing and intelligent; that the evidence is insufficient to support his conviction; that the trial court erred by sentencing him to the maximum punishment in the range and by not granting his request for full probation; and that the trial court erred by setting his amount of restitution at $2,000 and by not considering his ability to pay. The State concedes error in the trial court's restitution order. Based upon the oral arguments, the record, and the parties' briefs, we reverse the trial court's order that the Appellant pay $2,000 in restitution and remand the case for further proceedings consistent with this opinion. The judgment of the trial court is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part, Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Brian D. Wilson, Assistant Public Defender-Appellate Division (on appeal), Franklin, Tennessee, and John Fortuno (at sentencing and motion for new trial), Cleveland, Tennessee, for the Appellant, Otto Karl Appelt.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen Davis Crump, District Attorney General; and Joseph Hoffer, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## I. Factual Background

On September 18, 2019, the Bradley County Grand Jury indicted the Appellant for vandalism of property valued more than $1,000 but less than $2,500. The Appellant represented himself at trial.

John Bennudriti testified that he used to own Cleveland Super Wash House, a laundromat on South Lee Highway, and that he had a "good" surveillance system in the laundromat. On March 22, 2019, the "cleaning lady" for the laundromat telephoned Bennudriti's wife and told her that "we've got a lot of damage to these dryers here" and that "you need to come see this." Bennudriti said that he "didn't think much about it" and that he could not go to the laundromat that day. Two days later, he went to the laundromat and saw that the drums inside four commercial dryers were "very heavily covered in paint." Bennudriti identified photographs showing the paint inside the dryers.

Bennudriti testified that he reviewed the laundromat's March 22 surveillance video and that he found the exact times the dryers had been damaged. He said the video showed that the Appellant came into the laundromat at 3:37 a.m. and that the Appellant appeared to be wearing black latex gloves. The Appellant put paint-soaked rags into the dryers and turned on the dryers. He returned about ten minutes later and then another forty-five minutes later to put additional money in the dryers to keep the rags rotating. Bennudriti telephoned the police and gave them the surveillance video, but he did not have the rags because the cleaning lady threw them away. The State played the surveillance video for the jury.

Bennudriti testified that he was "totally familiar" with the Appellant as a customer in the laundromat and that he recognized the Appellant in the video "right off the bat." Bennudriti explained that he had seen the Appellant a couple of times in person and that he had seen the Appellant on surveillance video previously because the Appellant would come into the laundromat one or two times per week to wash clothes. The Appellant walked with a "very pronounced limp," often wore shorts, and always came into the laundromat "in the middle of the night about the same time." Bennudriti said that certain things "triggered" the Appellant and that the Appellant would tape notes onto the glass doors of the laundromat. For example, one time the laundromat's water heater was not working and was not repaired for several weeks, so the Appellant taped a note onto the door. Bennudriti said that all of the notes were "printed [off] a computer off of a Gmail account" and that the notes were "really, really vulgar, nasty, gibberish nonsense sort of talk." Bendudriti would see the Appellant on the surveillance video taping the notes onto the doors, and Bennudriti or the cleaning lady always removed the notes.

Bennudriti testified that he had a Master of Business Administration in Finance from the University of Tennessee Chattanooga, that he worked as a commercial banker for seventeen years, and that he had been in the laundromat business since 2004. He said repairing washers and dryers was "[c]ommon" and part of his "everyday business," and he estimated that he had repaired "[h]undreds" of washers and dryers. Bennudriti explained that the holes in the drums of the four damaged dryers were "covered" with beige-colored paint. The paint had gone into the holes and had damaged the sensors in the dryers. Paint also was on the glass doors of the dryers. Bennudriti tried to repair one of the dryers himself. He explained that he bought brushes, scrapers, and chemicals and that he spent eight hours cleaning the dryer "just to see if [he] could get at least one of them working." Bennudriti got the dryer to operate but ended up having the dryers professionally repaired. He estimated that his total cost to repair the dryers was $2,000. Bennudriti said that the damage to the dryers was "the straw that broke the camel's back," that he "didn't want to see this place anymore," and that he sold the laundromat at a loss just to get rid of it.

On cross-examination, Bennudriti testified that the Appellant was a regular customer at the laundromat. One day about a year before this incident, Bennudriti arrived at the laundromat to find one of the doors propped open with a chair. The Appellant was washing his clothes and had propped open the door because he did not like the temperature inside the laundromat. Bennudriti said that he removed the chair and that the Appellant went "beserk" and "nuts." The Appellant started yelling and screaming at Bennudriti about the temperature inside the laundromat, and Bennudriti "tried to diffuse him." The Appellant told Bennudriti to "go to hell," so Bennudriti told the Appellant not to come back to the laundromat. The Appellant responded, "[D]on't worry. I won't." Bennudriti did not see the Appellant in person after that incident, but he knew the Appellant was still coming into the laundromat because he would see the Appellant on the surveillance video.

Officer Willie Espinoza of the Cleveland Police Department testified that on March 24, 2019, he responded to a call at a laundromat on South Lee Highway. He met with John Bennudriti, and Bennudriti showed him four dryers that Bennudriti said were "covered in paint." Officer Espinoza looked in the dryers and saw the paint. Bennudriti also showed Officer Espinoza surveillance video, and Officer Espinoza saw "a white male, kind of heavy set walking into the laundromat with a distinct limp." The man put rags into the dryers, turned on the dryers, and walked out of the laundromat. Officer Espinoza noticed the man was wearing blue shorts and gloves.

Officer Espinoza testified that Bennudriti thought he knew the man and that a customer in the laundromat said Officer Espinzoa could find the man at the Crown Inn motel. Officer Espinzoa went to the motel, which was "just down the road," and took with him a still image of the man from the surveillance video. The officer spoke with the owners of the motel, and they told him a room number. Officer Espinoza and his partner went to the room and knocked on the door for a few minutes. The Appellant finally opened the door. Officer Espinoza asked for the Appellant's name, and the Appellant gave it to him.

The Appellant was wearing shorts but no shirt, and Officer Espinoza noticed that the Appellant was wearing the same blue shorts as the man in the video.

Officer Espinoza testified that his partner read Miranda warnings to the Appellant and that Officer Espinoza asked if the Appellant had vandalized the dryers. Officer Espinoza said that he did not remember the Appellant's response but that the Appellant "did ask me how much his bail was going to be." Officer Espinoza arrested the Appellant because the Appellant had the same distinct walk and was wearing the same shorts as the man in the video.

At the conclusion of Officer Espinoza's direct testimony, the Appellant requested that the video from Officer Espinoza's "bodycam" be played for the jury. We have reviewed the video. The video showed that Officer Espinoza asked the Appellant why he vandalized the dryers and that Officer Espinoza's partner read Miranda warnings to the Appellant. Officer Espinoza again asked the Appellant why he vandalized the dryers, but the Appellant would not answer the question and asked about his bail. The officers allowed the Appellant to go back into his room to get dressed so they could take him to jail. While the officers were waiting at the door, Officer Espinoza commented to his partner that the Appellant's motel room was "very organized." Officer Espinoza's partner responded something to the effect of "probably like Rain Man." Officer Espinoza then said something about "OCD."

On cross-examination, Officer Espinoza testified that he did not see any paint-soaked rags at the laundromat and that Bennudriti did not have the rags. Officer Espinoza did not see any paint on the Appellant's shorts when he arrested the Appellant, and he did not search the Appellant's motel room for paint or rags. Officer Espinoza acknowledged that he and his partner could be heard referring to the Appellant as "nuts" and "Rain Man" in the bodycam video.

After Officer Espinoza's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of vandalism of property valued more than $1,000 but less than $2,500. After a sentencing hearing, the trial court sentenced him to two years to be served as four months in jail followed by supervised probation.

A. Waiver of Right to Counsel

The Appellant claims that he was denied his right to counsel because the trial court did not question him adequately when he signed his written waiver to ensure that he knowingly and intelligently waived his right to counsel. The State argues that the Appellant has waived the issue because he failed to raise it in his motion for new trial. The State also argues that the trial court did not commit plain error because the trial court gave "Smith warnings" to the Appellant at a pretrial hearing and later informed the Appellant at trial, when the Appellant signed the written waiver of his right to counsel, about the nature

- 4 -

of the charges against him, his criminal exposure, and his right to have counsel appointed for him. We agree with the State.

On March 24, 2019, the Appellant was charged with vandalism pursuant to an arrest warrant filed in general sessions court. The Appellant submitted an affidavit of indigency, stating that his income was $771 per month in social security disability benefits and that his rent was $780 per month, but the general sessions court found him not indigent and did not appoint him an attorney. On August 20, 2019, the Appellant executed a written waiver of his right to counsel in general sessions court.

On September 18, 2019, the Bradley County Grand Jury indicted the Appellant for vandalism of property valued more than $1,000 but less than $2,500. On October 14, 2019, Judge Andrew Frieberg signed an order of arraignment which reflected that the Appellant wanted to represent himself. At the bottom of the arraignment form, Judge Frieberg wrote, "No waiver or colloquy regarding right to counsel was conducted this date."

On November 25, 2019, the trial judge, Sandra Donaghy, held a status hearing.[1] At the outset of the hearing, the trial court noted that Judge Frieberg arraigned the Appellant on October 14, 2019, and "wrote down that you wanted to represent yourself." The trial court asked if the Appellant wanted to represent himself, and he said yes. The following exchange then occurred:

> THE COURT: Excuse me, sir. The only thing I want to caution you about is this- let's see what you're accused of first of all. You are accused of vandalism to a dryer at Cleveland Super-Wash. And it says that the amount of damage was more than a $1,000 dollars, but less than $2,500. That means it's a Class E felony that carries a range of punishment somewhere from one year to six years, and a fine that could go as high as $3,000 dollars over, and above the restitution. Do you understand that, sir?
>
> DEFENDANT APPELT: Yes, ma'am.
>
> THE COURT: Okay. Now, when you're in criminal court the proceedings are very formal. Insomuch as, you have to file a motion for discovery -
>
> DEFENDANT APPELT: And I did that already.

---

[1] The original appellate record did not include a transcript of the November 25, 2019 hearing. We note that it is the Appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review. See Tenn. R. App. P. 24(b). Nevertheless, on April 4, 2022, this court entered an order on its own motion directing that the trial court clerk supplement the record with the transcript.

THE COURT: --okay, to get the information from the State, and then if you want to have a hearing of some sort, you have to have your witnesses subpoenaed. If you have a hearing, since you're being your own lawyer, you are held to know and understand the Rules of Criminal Procedure, and the Rules of Evidence, just like anybody who goes through law school. Said another way -- I cannot help you, you're on your own. And then I'll be ruling -- if you ask a question that is violative [of] the Rules of Evidence, and the District Attorney says objection -- if I find that it is violative [of] the Rules of Evidence, then I would sustain that objection and you don't get an answer to that question. So do you understand, I can't help you. You're on your own, if you are your own lawyer.

DEFENDANT APPELT: It's understood.

THE COURT: All right. The other thing that many people don't understand that you should understand is -- that if you choose to call yourself as a witness, you have to ask yourself a question, and then answer it. And then, ask yourself another question and answer it, so you can't just get up and start telling a story. It has to be by question and answer, do you understand that, sir?

DEFENDANT APPELT: Yes.

THE COURT: All right. So, is it -- is it so that you still wish to represent yourself knowing the rules that you're going to be held accountable to?

DEFENDANT APPELT: Yes, Your Honor.

. . . .

THE COURT: Okay. . . . I'm going to write down that the Court went over a summary of the Smith factors. Those are the warnings that the Court should give to someone [who's] trying to represent them, so that you know with open eyes what you're getting into. One of those warnings that I did not say -- cautions you that -- you know, you're going up against a licensed attorney whose been through law school, and has studied these things. And it's never a good idea to represent yourself, because you'll be having to follow the Rules of Evidence, the Rules of Criminal Procedure, and developing a strategy all on your own. And when you are emotionally tied to the case, sometimes it's difficult to objectively analyze things when you are emotionally [or] subjectively involved in the matter. But that's a decision only you can make, sir. So, I'm going to write down that I gave you these

Smith warnings, but that nonetheless, you choose to represent yourself -- which you have a right to do under the constitution.

The Appellant proceeded to trial on March 5, 2020. After the jury had been selected but prior to the jury's being sworn, the trial court sent the jury out of the courtroom and took a brief recess. When the trial court and the parties returned to the courtroom, the trial court addressed the Appellant as follows:

[THE COURT:] The next piece of information that I want is earlier I talked with you. According to my notes it was on November 25th, 2019, about warning you that it's not a good idea to be your own lawyer. Quite frankly, you're doing a very good job so far. I want for my file a written waiver of attorney.

MR. APPELT: Well, Your Honor, can I just say something about that representing myself?

THE COURT: Yes, sir.

MR. APPELT: When I was in Judge Randolph's court, I had applied twice for defense counsel and he shot them both down. He was under the impression that I was able to fork out $5,000 to bail myself out, you know. Now I've seen defendants come before you and you at least go into a little more background about, you know, well, okay, you made bail, but let's deal with now what your expenses are and how much you're making.

THE COURT: Yes, sir. I don't have any control over what Judge Randolph does or not.

MR. APPELT: Well, I was just letting you know that it didn't start out that way.

THE COURT: Well, but ever since I have contact with you my notes show that you were originally arraigned by Judge Frieberg, that you told him you wanted to represent yourself. And then when you and I talked November 25th, 2019, I went through those -- I call them Smith warnings.

MR. APPELT: Well, no, I'm still comfortable with it.

THE COURT: All right. So for the file I would like you to read this paper and if this is how you feel, to sign on the line saying you are waiving in writing your right to counsel.

- 7 -

. . . .

MR. APPELT: All right.

THE COURT: Good. So, Mr. Appelt, let me put you under oath. You can you can actually stay where you are.

(Defendant sworn.)

THE COURT: So, Mr. Appelt, you've handed me this paper that seems to have your signature on it. Did you just sign this here in the courtroom?

MR. APPELT: I did.

THE COURT: And it says that you have been informed of the charges against you, and you know that what you're accused of is vandalism over $1000 in value but less than $2500. So that would be a class E felony. A class E felony caries a range of punishment from one to two years and a fine that might go as high as $3000. Do you understand that?

MR. APPELT: Yes.

THE COURT: Then it also says that you've been informed of the statutory punishment. That's what I just did. You have the right to have counsel appointed, and if you are unable to employ counsel, then that's when one -- an attorney would be appointed for you. But you also have the constitutional right to represent yourself. And that's what you and I talked about way back in November 25th of 2019. And you have affirmed it as we went along. So is it still your desire to give up your constitutional right to have a lawyer represent you because you desire to represent yourself?

MR. APPELT: Yes.

THE COURT: All right. I'm going to sign because I accept this waiver. I find that you freely and voluntarily have given up your right to counsel.

The United States Constitution and the Tennessee Constitution guarantee an indigent defendant the right to be represented by appointed counsel during a criminal trial. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Likewise, "persons accused of crime have a right of self-representation at trial that is protected by the same constitutional provisions that guarantee their right to counsel." Lovin v. State, 286 S.W.3d 275, 284

(Tenn. 2009) (citing Faretta v. California, 422 U.S. 806, 807 (1975); State v. Small, 988 S.W.2d 671, 673 (Tenn. 1999); State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984)). "The right to represent oneself, however, should be granted only after a determination by the trial court that the defendant is both knowingly and intelligently waiving the valuable right to assistance of counsel." Small, 988 S.W.2d at 673.

There are three essential prerequisites to activating the right of self-representation. First, the right to proceed pro se must be timely asserted. State v. Hester, 324 S.W.3d 1, 30 (Tenn. 2010). Second, the defendant's request to proceed pro se must be clear and unequivocal. Id. Finally, "the assertion of the right of self-representation must reflect a knowing and intelligent waiver of the right to counsel." Id. at 30-31. Tennessee Rule of Criminal Procedure 44 provides that prior to accepting a waiver of counsel, the trial court must "advise the accused in open court of the right to counsel at every stage of the proceedings" and "determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters." Tenn. R. Crim. P. 44(b)(1)(A), (B). Moreover, the Rule requires that the waiver be in writing. Tenn. R. Crim. P. 44(b)(2).

In order to determine the knowing nature of a defendant's waiver, this court has suggested that trial courts follow the guidelines contained in 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed. 1986). Smith v. State, 987 S.W.2d 871, 875 & appendix (Tenn. Crim. App. 1998) (quoting the suggested line of questioning from the Bench Book). Those guidelines, which the trial court in this case referred to as "Smith warnings," include approximately thirteen questions the trial court should ask a defendant about proceeding pro se and several warnings from the trial court that self-representation is "unwise" and "strongly" discouraged. Id. Additionally, the United States Supreme Court has instructed as follows:

> "[A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."

State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984) (quoting Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)).

"The determination of whether a defendant has exercised his or her right of self-representation and has concurrently waived his or her right to counsel is a mixed question of law and fact." Hester, 324 S.W.3d at 29. This court reviews mixed questions of law and fact de novo with a presumption that the trial court's findings of fact are correct. Id. at 29-30. Any error in denying a defendant of the right to counsel is a structural constitutional error requiring automatic reversal. State v. Frausto, 463 S.W.3d 469, 484 (Tenn. 2015).

First, we must address the State's waiver argument. The day after the jury convicted the Appellant, he submitted an affidavit of indigency, and the trial court appointed counsel to represent him. Counsel represented the Appellant at sentencing, filed a motion for new trial on his behalf, and represented him at the hearing on the motion for new trial. However, counsel did not raise the trial court's denial of the right to counsel in the new trial motion or at the motion hearing.

Generally, the failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review. See Tenn. R. App. P. 3(e). The Appellant asserts in his reply brief that "reviewing whether a waiver of the constitutional right to counsel occurred should not require pro se defendants to meet the heightened standard of plain error" and that, in any event, all of the factors for plain error relief are satisfied in this case.

In State v. Duane A. Peters, a case in which the pro se appellant asserted on appeal that he was denied his Sixth Amendment right to counsel at trial, the State also argued that the appellant had waived the issue for failing to raise it in his motion for new trial. No. 03C01-9112-CR-00382, 1992 WL 74552, at *2 (Tenn. Crim. App. at Knoxville, Apr. 15, 1992). However, this court rejected the State's waiver argument, explaining,

We find [the State's argument] to be rather ingenuous. Counsel is required to protect the rights of an accused. The accused goes to trial without counsel. Upon appeal he raises the denial of counsel as a basis for a new trial. Are we to deny relief because the uncounseled appellant did not know he must raise the issue in his motion for a new trial? These are the things which make the denial of counsel prejudicial and the right to counsel mandatory unless properly waived.

Id.

Turning to the instant case, we would be inclined to agree with this court's reasoning in Duane E. Peters and reject the State's waiver argument if the Appellant had continued to represent himself after trial. However, the trial court appointed counsel to represent him the day after the jury convicted him of vandalism. Counsel represented him at sentencing,

filed a motion for new trial on his behalf, and represented him at the hearing on the motion but did not raise the issue in the trial court. Moreover, this court has held that plain error review applies to issues involving structural constitutional error, including waiving the right to counsel, when a defendant fails to raise the issue in a motion for new trial. State v. Franklin, 585 S.W.3d 431, 471-74 (Tenn. Crim. App. 2019); State v. Corey C. Abernathy, No. E2005-00266-CCA-R3-CD, 2005 WL 3447672, at *6 (Tenn. Crim. App. At Knoxville, Dec. 14, 2005). Accordingly, the Appellant must seek relief under the plain error doctrine.

We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn.Crim.App.1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Here, the record is clear as to what happened in the trial court. On November 25, 2019, the trial court questioned the Appellant pursuant to Smith about his waiving his right to counsel. The trial court advised the Appellant of the charge in the indictment and its potential punishment, including the possible fine, and asked if he understood. The trial court informed the Appellant that he would be expected to know and understand the Rules of Criminal Procedure and the Rules of Evidence, that the court would be ruling on evidentiary issues based on the Rules of Evidence, that the court could not help him, and that he would have to ask and answer questions if he testified. The trial court warned the Appellant about what he was "getting into," that he would be "going up against a licensed attorney," and that it was "never a good idea" to represent himself. While the trial court did not ask all of the questions suggested in Smith, such as whether the Appellant had ever studied law or had ever represented himself or someone else in a criminal action, the trial court substantially complied with the format suggested in Smith. See State v. Mark Takashi, No. E2010-01818-CCA-R3-CD, 2012 WL 4459861, at *4 (Tenn. Crim. App. at Knoxville, Sept. 27, 2012); State v. Rodrickus Carlos Jefferson, No. M2009-01279-CCA-R3-CD, 2011 WL 1874031, at *10 (Tenn. Crim. App. at Nashville, May 10, 2011); State v. Marshall A. Brabson, No. E2006-02698-CCA-R3-CD, 2008 WL 450635, at *5 (Tenn. Crim. App. at Knoxville, Feb. 20, 2008); Luther E. Fowler v. State, No. 03C01-9711-CR-00509, 1999 WL 552938, at *10 (Tenn. Crim. App. at Knoxville, July 30, 1999). The

Appellant advised the trial court that he had already filed a pro se motion for discovery and that he wanted to represent himself.

On March 5, 2020, the trial court had the Appellant sign a written waiver of his right to counsel and again informed him of the charged offense, his potential punishment, his right to have counsel appointed if he could not afford an attorney, and his right to represent himself. The trial court asked if the Appellant still wanted to represent himself, and he again said yes.

The Appellant asserts that the trial court was required to utilize the "Smith warnings" when he signed his written waiver. However, he has not cited to any case in which an appellate court has stated that the trial court is required to utilize the Smith guidelines at the time a defendant executes a written waiver of counsel. In fact, this court has held that the failure to execute a written waiver does not necessarily invalidate a defendant's otherwise constitutionally valid waiver of the right to counsel and that a defendant's complete failure to sign a written waiver was harmless error when the trial court thoroughly questioned the defendant about his request to waive counsel and warned him about doing so. See State v. Nathaniel Morton Champion, No. M2016-01648-CCA-R3-CD, 2018 WL 2278176, at *12 (Tenn. Crim. App. at Nashville, May 18, 2018); State v. Simmie Black, No. 02C01-9803-CR-00081, 1999 WL 280810, at *4 (Tenn. Crim. App. at Jackson, May 7, 1999).

That said, we are not condoning a trial court's failure to obtain a written waiver as required by Tennessee Rule of Criminal Procedure 44, and we think the better practice is to make the inquiry and follow the guidelines in Smith when the trial court accepts the written waiver. Our point is that a trial court's inquiry about a defendant's request to waive counsel is the most significant factor to consider in determining whether the defendant knowingly and intelligently waived the right to counsel.

In this case, the record demonstrates that the trial court both substantially complied with guidelines in Smith and had the Appellant sign a written waiver. Although the trial court did not repeat the "Smith warnings" when the Appellant signed the waiver, the trial court advised him again of the charged offense, his potential punishment, and his right to have an attorney. The trial court asked if he still wanted to represent himself, and he said yes. Therefore, we conclude that the Appellant has failed to show that a clear and unequivocal rule of law was breached, that a substantial right of the Appellant was affected, or that consideration of the error is necessary to do substantial justice. Thus, he is not entitled to plain error relief on this issue.

## B. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support his conviction of vandalism of property valued more than $1,000 but less than $2,500 because the State

failed to show that he intentionally or knowingly damaged the dryers. In the alternative, he claims that this court should amend his conviction to vandalism of property valued one thousand dollars or less, a Class A misdemeanor, because the State failed to prove the cost to repair the dryers.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

A person commits vandalism when the person knowingly causes damage to or the destruction of any real or personal property of another and knows that the person does not have the owner's effective consent. Tenn. Code Ann. § 39-14-408(b)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Vandalism is a Class E felony if the value of the property is more than $1,000 but less than $2,500. Tenn. Code Ann. § 39-14-105(a)(2). The value of the damaged property is to be determined under Tennessee Code Annotated section 39-11-106. Tenn. Code Ann. § 39-14-408(c)(1) (2019). At the time of the crime, the definition of "value" was "[t]he fair market value of the property or service at the time and place of the offense." Tenn. Code

Ann. § 39-11-106(a)(36)(A)(i) (2018).[2] Generally, "[a] witness may testify to the value of the witness's own property or services." Tenn. R. Evid. 701(b). It is the jury's prerogative to determine the fair market value of the items. State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981).

The Appellant claims that the evidence is insufficient to support his vandalism conviction because the proof failed to show that he was aware that his actions were reasonably certain to damage the dryers. According to the Appellant, "Simply entering a laundromat and placing objects into a dryer does not attach intent or certainty that these actions would result in damage." However, taken in the light most favorable to the State, the proof shows that about a year before this incident, the Appellant and the owner of the laundromat, John Bennudriti, got into an argument. The Appellant yelled at Bennudriti, and Bennudriti told him not to come back to the laundromat, but the Appellant continued to patronize the business. He also posted "vulgar, nasty" complaints on the doors of the laundromat. On March 22, 2019, video surveillance recorded the Appellant entering the laundromat and putting paint-soaked rags into the dryers. He was wearing gloves. He turned on the dryers and returned to the laundromat two more times to put more money in the dryers so the drums would keep rotating. However, nothing indicates that he ever returned to the laundromat to retrieve the dry rags. We conclude that the evidence is sufficient to support the Appellant's vandalism conviction.

The Appellant also claims that Bennudriti's "ballpark estimate" for repairing the dryers was not sufficient to establish the value of the damaged property. We disagree. Bennudriti testified that he had been in the laundromat business since 2004 and that repairing washers and dryers was "common" and part of his "everyday business." In describing the damage to his property, he said that the dryers were commercial dryers and that the drums inside the dryers were "covered" with paint. Photographs of the dryers confirmed that paint was inside the dryers and on the glass doors of the dryers. Bennudriti said the paint had gone into the holes of the drums and had damaged the sensors in the dryers. He bought cleaning supplies and spent eight hours trying to clean one of the dryers but ended up having all four of the dryers repaired. He estimated that the cost to repair the dryers totaled $2,000. We note that "[t]he owner of the property is permitted to testify about [his] opinion of the value of the property. Moreover, the value of the cost of repairs is an appropriate means of determining the value of the damage sustained to the vandalized property." State v. Nona Pilgram, No. E2004-00242-CCA-R3-CD, 2005 WL 602380, at *5 (Tenn. Crim. App. at Knoxville, Mar. 14, 2005) (citation omitted). Therefore, we conclude that the evidence is sufficient to sustain the Appellant's conviction for vandalism of property valued more than $1,000 but less than $2,500.

---

[2] We note that effective August 20, 2020, the definition of "value" also provides that "[f]or a violation of § 39-14-408(b)(1), the value of the property includes the fair market value of repairing, cleaning, and restoring the property." Tenn. Code Ann. § 39-11-106(a)(39)(E) (2020).

## C. Sentencing

Next, the Appellant claims that the trial court erred by sentencing him to the maximum punishment in the range for a Class E felony because the trial court misapplied three enhancement factors and that the trial court erred by not ordering full probation because the trial court did not conduct a proper analysis of his rehabilitation potential. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

At sentencing, Sherry Gaston of the Tennessee Department of Correction, Probation and Parole, testified that she interviewed the Appellant on the telephone and prepared his presentence report. The Appellant told Gaston that he was a high school graduate, that he spent time in the United States Air Force, and that he had "a few" physical issues but no mental health issues. The Appellant filled out a questionnaire for Gaston and mailed it to her. In the questionnaire, the Appellant said he was dishonorably discharged from the Air Force "due to aggravated arson and simple assault." Gaston investigated the Appellant's criminal history and learned that he had been convicted of harassment in April 2018, aggravated arson in July 2004, and two counts of assault and one count of malicious mischief in 2002. On cross-examination, Gaston acknowledged that vandalism was a non-violent crime and that she did not find any incidents of violation of probation or parole by the Appellant.

The State introduced the Appellant's presentence report into evidence. According to the report, the then fifty-three-year-old Appellant was single with no children. He stated in the report that he received a high school diploma in 1984 and that he served in the United States Air Force from August 1987 to March 1991 when he was dishonorably discharged. In the report, the Appellant said he was dishonorably discharged due to federal convictions of aggravated arson and simple assault in July 1989 in Portsmouth, New Hampshire.[3] The Appellant described his mental health as "good" and said he had never been diagnosed with a mental issue. He described his physical health as "fair" due to an ear infection, partial paralysis of his right arm, and a "degenerative right hip." The Appellant also thought he had suffered a stroke recently. The Appellant said in the report that he consumed one beer about every six weeks and that he had never used illegal drugs. He stated that he was unemployed from 2013 to 2017, that he began receiving social security disability payments in 2017 due to a degenerative disk in his hip, that his father helped him financially, and that he "cared for and lived with, off and on, a person that had mental health issues."

The Appellant gave a statement for the report in which he said that this case was headed for "inevitable reversal" pursuant to Gideon v. Wainwright and that he wanted to "maintain his silence on what now smells of entrapment inadvertency." The Appellant also said that he was denied his Sixth Amendment right to counsel twice in general sessions

---

[3] Those convictions were not listed in the "Prior Record" section of the presentence report.

- 15 -

court; that the assistant district attorney "surreptitiously acquired defense counsel's work product," which was his own work product because he represented himself at trial, while he was at lunch; and that someone named "Joseph V." intimidated a witness.

The presentence report confirms that the Appellant was convicted of harassment in Bradley County in April 2018 and that he received a sentence of eleven months, twenty-nine days, which was suspended to time served. According to the victim's affidavit in that case, the Appellant threatened to mail a pipe bomb to the victim, who was the mother of the Appellant's nephew. The presentence report also confirmed that in 2004, the Appellant was convicted in federal court of aggravated arson. For that conviction, he received a sentence of ninety-six months in confinement followed by thirty-six months on probation and was ordered to pay $395,918 in restitution for destruction of a commercial structure. Finally, the report confirmed that the Appellant was convicted of two counts of assault and one count of malicious mischief in Maine in 2002.[4] The victim gave a statement in that case, and the statement was included in the presentence report as follows: The victim, an attorney, declined to represent the Appellant in a civil matter. On January 19, 2001, the Appellant arrived at the victim's office and asked to speak with him. The victim and the Appellant went into a conference room, and the victim again told the Appellant that he did not want to represent the Appellant. The Appellant pulled out a bottle, took off the cap, and "squirted" yellow paint into the victim's eyes. The Appellant then squirted paint on the victim's face and body, on the furniture, and on the walls. He also tried to squirt paint on the victim's assistant.

The Appellant's Strong-R assessment classified his overall risk to reoffend as low. The assessment concluded that he had moderate needs relevant to "Attitudes/Behaviors," "Aggression," "Family," and "Education" and low needs relevant to "Friends," "Mental Health," "Alcohol/Drug Use," "Residential," and "Employment."

The trial court stated that it had considered the evidence presented at trial and at sentencing, including the presentence report and the Strong-R assessment; enhancement and mitigating factors; statistical information from the Administrative Office of the Courts; the Appellant's statement in the presentence report; the principles of sentencing and arguments as to sentencing alternatives; the facts and circumstances surrounding the offense; and the nature and circumstances of the conduct involved in the case. The trial court noted that the Appellant had never expressed any remorse for damaging the dryers and that the Appellant had a history of resorting to violence when angered, which was "troublesome" to the trial court. The trial court noted that the Appellant said in the presentence report that he did not have any mental issues. The court stated that the court was "not a doctor" but that it thought the Appellant either had "some sort of mental problem" for which he should seek treatment or was "just mean" and ought to be jailed. The trial court noted that according to the Appellant's statement for the presentence report,

---

[4] The parties stipulated that the three convictions would be misdemeanors in Tennessee.

he "effectively asserts a right to remain silent," that he "talks about entrapment, and inadvertency," and that "[h]is writings don't make sense."

The trial court stated that the record showed the Appellant was placed on probation for eleven months, twenty-nine days for harassment on April 24, 2018. Therefore, the trial court concluded that he must have been on probation when he committed the offense in this case. The trial court stated that although the Appellant's Strong-R assessment classified his overall risk to reoffend as low, the trial court gave "little value" to that assessment. The trial court then found that the following enhancement factors applied to the Appellant's conviction: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (7) the "offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement"; (8) "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; and (13) at the time the felony was committed, the defendant had been released on probation. Tenn. Code Ann. § 40-35-114(1), (7), (8), (13(C)). The trial court found no mitigating factors applicable and sentenced the Appellant as a Range I, standard offender to two years, the maximum punishment in the range for a Class E felony. See Tenn. Code Ann. § 40-35-112(a)(5).

Regarding alternative sentencing, the trial court stated that when the Appellant was given an opportunity to give a statement for the presentence report, he claimed he was denied his right to counsel twice in general sessions court and that the assistant district attorney saw his work product. The trial court noted that the Appellant did not think he needed any treatment or needed to be rehabilitated. The trial court thought both of those factors suggested he was not going to be "a good probationer."

In addressing the principles of sentencing and arguments as to sentencing alternatives, the trial court found that the Appellant had a "sporadic history of dangerous behavior" and, therefore, that it could not find he had a long history of criminal conduct so that society needed to be protected from him. Nevertheless, the trial court stated that if the Appellant did not receive some form of mental health or anger management treatment, his risk to reoffend was great. Next, the trial court found that by putting paint-soaked rags into a hot dryer, the Appellant committed a dangerous crime so that confinement was necessary to avoid depreciating the seriousness of the offense and that confinement was necessary to deter the Appellant and others. Finally, the trial court did not find that measures less restrictive than confinement had been frequently or recently applied unsuccessfully to the Appellant.

The trial court questioned whether the Appellant could be rehabilitated but stated that it had "a duty to give him a chance." The trial court ordered that he serve four months in jail with credit for time served and ordered that he serve the remainder of his two-year sentence on supervised probation. The trial court also ordered that he be evaluated while

- 17 -

in confinement to determine whether he had mental health or anger management issues that needed to be addressed.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); State v. Caudle, 388 S.W.3d 273, 79 (Tenn. 2012) (applying the standard to alternative sentencing). In determining a defendant's sentence, including the manner of service, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. § 40-35-210(b); see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a

manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

In this case, the record demonstrates that the trial court took into consideration all of the sentencing factors and explained its reasoning for imposing the Appellant's sentence. Therefore, we review the sentence for an abuse of discretion with a presumption of reasonableness.

The Appellant claims that the trial court misapplied enhancement factors (7), (8), and (13). In applying enhancement factor (7), that the offense involved a victim and was committed to gratify the Appellant's desire for pleasure or excitement, the trial court stated, "The record is devoid of why this crime occurred. And so the only logical inference is that the defendant did it to excite himself or to get some sort of retribution." Our supreme court has explained that enhancement factor (7) calls into question a defendant's motive for committing an offense. State v. Kissinger, 922 S.W.2d 482, 491 (Tenn. 1996). Because human motivation is a "tangled web," proving a defendant's motive will always be a difficult task. Id. While enhancement factor (7) is often used to enhance sentences for offenses that are of a sexual nature, it may also be applied to enhance the sentences of other offenders, and our supreme court has given the following examples of when enhancement factor (7) is applicable:

> An offender who steals because of a pleasure experienced in "not getting caught;" an arsonist who burns houses due to the excitement that watching fire brings; an assaulter who breaks an arm to hear the victim beg for mercy- all may have their sentences enhanced under factor (7) providing the state produces proof of the factor.

Id. at 490. "The mere absence of proof of some other motivation for committing the offense is insufficient to establish, by a preponderance of the evidence, that pleasure or excitement was the motive." State v. John Robert Benton, No. E2000-03194-CCA-R3-CD, 2001 WL 818204, at *5 (Tenn. Crim. App. at Knoxville, July 20, 2001). On the other hand, "[t]he motive need not be singular for the factor to apply, so long as defendant is motivated by defendant's desire for pleasure or excitement." Kissinger, 922 S.W.2d at 490.

We agree with the trial court that the evidence supports a finding that the Appellant was motivated to vandalize the dryers as some form of retribution or revenge. Moreover, revenge can be a form of excitement. However, we do not think the evidence in this case supports a conclusion that the Appellant also vandalized the dryers to gratify his desire for pleasure or excitement.

Regarding factor (8), that the Appellant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, the trial court applied that factor because the Appellant was on probation for the 2018 harassment

- 19 -

conviction when he committed the offense in this case. As the Appellant points out, though, "[t]he commission of the offense for which the defendant is being sentenced does not make factor (8) applicable because there must be a previous history of unwillingness to comply." State v. Adams, 45 S.W.3d 46, 60 (Tenn. Crim. App. 2000) (citing State v. Hayes, 899 S.W.2d 175, 185-86 (Tenn. Crim. App. 1995)).

Regarding enhancement factor (13)(C), that at the time the felony was committed, the Appellant had been released on probation, the Appellant contends that the trial court misapplied the factor because this court has held that it only applies when a defendant was on probation for a felony conviction. Here, the trial court found the factor applicable because the Appellant was on probation for misdemeanor harassment. However, as noted by the State, our Code no longer requires that the probation stemmed from a felony conviction. See State v. Benjamin R. Franklin, No. M2018-01958-CCA-R3-CD, 2020 WL 4280692, at *26 (Tenn. Crim. App. at Nashville, July 27, 2020) (citing 2005 Tenn. Pub. Acts Ch. 353 (amending Tenn. Code Ann. § 40-35-114 in its entirety)), perm. app. denied, (Tenn. Nov. 12, 2020).

In sum, the trial court misapplied enhancement factors (7) and (8) but properly applied enhancement factors (1) and (13)(C). Our supreme court has explained that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed. . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Bise, 380 S.W.3d at 706. Given that the trial court properly applied two enhancement factors, we conclude that the trial court did not abuse its discretion by imposing a two-year sentence.

Regarding alternative sentencing, a defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The Appellant's sentence meets this requirement. In addition, a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The Appellant is considered to be a favorable candidate for alternative sentencing because he is a standard offender and the offense is a Class E felony.

The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective

deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

The trial court found that the Appellant should serve four months in confinement because confinement was necessary to avoid depreciating the seriousness of the offense, confinement was particularly suited to provide an effective deterrence to the Appellant and others likely to commit similar offenses, and the Appellant lacked potential for rehabilitation. The Appellant takes issue with comments the trial court made about his rehabilitation potential. Specifically, the trial court stated as follows:

When he was asked about his need for rehabilitation or treatment, he essentially said he doesn't have any problems. No mental health issues. No addiction issues. He doesn't need treatment.

The purpose of probation is to help somebody, to rehabilitate someone so that they can be a good citizen. And so if somebody says I don't have any need for help, that suggests they're not going to be a good probationer.

The Appellant contends that the trial court's reasoning was an improper analysis of his rehabilitation potential because "[p]otential for rehabilitation is not contingent on a defendant requesting some sort of treatment from the sentencing court or needing some sort of treatment to explain away the actions in question at sentencing."

The trial court's comments demonstrate that the court was very troubled by the Appellant's pattern of using violent behavior in response to anger and that the court thought his behavior was due to a mental health issue, an anger management issue, or "just being mean." We agree with the trial court that the Appellant's criminal history is both concerning and perplexing. The Appellant earned a high school diploma and served in the United States Air Force but was dishonorably discharged in 1991 for committing arson and simple assault. Subsequently, he was convicted of three offenses related to his "squirting" paint on an attorney who did not want to represent him in a civil matter. He also spent ninety-six months in confinement for a federal aggravated arson conviction and was ordered to pay almost four hundred thousand dollars in restitution for the damage he caused. He continues to commit crimes, being convicted of harassment for threatening to send a pipe bomb to a female family member in 2018 and of vandalism for damaging the

four dryers in this case. Yet he has never sought treatment for mental health or anger management issues. The Appellant's failure to seek treatment for whatever is causing his destructive behavior reflects poorly on his potential for rehabilitation. See State v. Robert L. Miller, No. 03C01-9502-CR-00037, 1997 WL 593811, at *6 (Tenn. Crim. App. at Knoxville, Sept. 25, 1997) (stating that defendant's failure to seek alcohol treatment and insistence on continuing to consume alcohol after committing crime in which alcohol was involved bore upon his prospects for rehabilitation). Therefore, we conclude that the trial court did not abuse its discretion by ordering that he serve four months in jail.

## D. Restitution

Finally, the Appellant contends that the trial court erred by ordering him to pay $2,000 in restitution because the trial court relied on an "arbitrary estimate" to determine the restitution amount and did not consider his ability to pay. The State acknowledges that the trial court failed to consider the Appellant's ability to pay.

Tennessee Code Annotated section 40-35-304(a) provides that "[a] sentencing court may direct a defendant to make restitution to the victim of the offense as a condition of probation." The amount must be based on the victim's pecuniary loss. See Tenn. Code Ann. § 40-35-304(b). "Pecuniary loss" consists of special damages and out-of-pocket expenses incurred by the victim relative to investigation and prosecution of the crime. Tenn. Code Ann. § 40-35-304(e). All restitution orders must be determined via the procedure in Tennessee Code Annotated section 40-35-304. See Tenn. Code Ann. § 40-35-304(g). The procedure requires, among other things, that the court "specify at the time of the sentencing hearing the amount and time of payment . . . and may permit payment or performance in installments." Tenn. Code Ann. § 40-35-304(c). The procedure also requires that the court "consider the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d). "[T]he trial court, in determining restitution, must also consider what the appellant can reasonably pay. An order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim." State v. Johnson, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997). "This court has previously determined that the abuse of discretion standard of review applies to decisions regarding restitution." State v. Jennifer Murray Jewell, No. M2015-02141-CCA-R3-CD, 2017 WL 65242, at *5 (Tenn. Crim. App. at Nashville, Jan. 6, 2017) (citing State v. David Allan Bohanon, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *5 (Tenn. Crim. App. at Nashville, Oct. 25, 2013)).

In ordering restitution, the trial court simply stated at the conclusion of the sentencing hearing that "[t]he court is also ordering that Mr. Appelt pay restitution to the laundromat owner. . . . So restitution to John Bennudriti in the amount of $2,000[.]" For reasons discussed earlier, we do not think the trial court abused its discretion by setting the amount of restitution at $2,000. However, the trial court did not consider the Appellant's ability to pay or specify the time or amount of payment. Therefore, the trial court's order

of restitution is reversed, and the case is remanded to the trial court for a hearing on the matter of restitution.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, the trial court's order that the Appellant pay $2,000 in restitution is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. The judgment of the trial court is affirmed in all other respects.

_____
NORMA MCGEE OGLE, JUDGE